Epes Logistics Servs., Inc. v. De Piante, 2025 NCBC 10.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

EPES LOGISTICS SERVICES, INC.,

        Plaintiff and
        Counterclaim Defendant,

v.

ANTHONY DE PIANTE, JILLIAN
CARON, and BRAD WIEDNER,

        Defendants and
        Counterclaim Plaintiffs,

and

NOBLE WORLDWIDE LOGISTICS,
LLC,

        Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19CVS008889-400

**ORDER AND OPINION ON CROSS
MOTIONS FOR SUMMARY
JUDGMENT
[Public][1]**

1. **THIS MATTER** is before the Court following the 15 May 2024 filing of *Plaintiff's Motion for Partial Summary Judgment* (Plaintiff's Motion), (ECF No. 198 [Pl.'s Mot.]), and *Defendants' Motion for Summary Judgment* (Defendants' Motion; and together, the Motions), (ECF No. 200 [Defs.' Mot.]). Pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the Rule(s)), the Motions, either in whole or in part, seek summary judgment as to all claims asserted in this action. (*See* Defs.' Mot.; Pl.'s Mot.)

---

[1] Recognizing that this Order and Opinion cites to and discusses the subject matter of documents that the Court has temporarily allowed to remain under seal in this action, the Court initially filed this Order and Opinion under seal on 24 February 2025, (*see* ECF No. 252) and requested that the parties advise the Court whether any portions of the Order and Opinion deserved to remain under seal. On 10 March 2025 the parties notified the Court that all parties conferred and agreed that there is no material in this Order and Opinion that requires sealing. Accordingly, the Court now files this public version of the Order and Opinion and will promptly unseal the previously filed version, (ECF No. 252).

2.     For the reasons set forth herein, the Court **GRANTS** in part and **DENIES** in part the Motions.

> *Tuggle Duggins P.A., by Alexandria B. Morgan, Brandy L. Mansouraty, Daniel D. Stratton, and Jeffrey S. Southerland, for Plaintiff/ Counterclaim Defendant.*
>
> *Womble Bond Dickinson (US) LLP, by Philip J. Mohr, for Defendants/ Counterclaim Plaintiffs.*

Robinson, Chief Judge.

## I.     INTRODUCTION

3.     This case arises from Defendants Anthony De Piante, Jillian Caron, and Brad Wiedner's resignation from Epes Logistics Services, Inc. (Epes), and their alleged access to and use of, Epes' confidential information to begin their own competing business in the same industry as Epes. Epes contends that the Defendants conspired to, and did in fact, use the confidential information of Epes to gain a competitive and unfair advantage over Epes, while simultaneously taking Epes' employees to begin working at their new venture.

4.     Following fulsome discovery, the Court must now consider the evidence of record to determine what claims, if any, should proceed to trial.

## II.     FACTUAL BACKGROUND

5.     The Court does not make findings of fact when ruling on a motion for summary judgment. "[T]o provide context for its ruling, the court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *6 (N.C. Super. Ct. Sept. 26, 2017); *see also Hyde Ins. Agency,*

*Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975) (encouraging the trial court to articulate a summary of the relevant evidence of record to provide context for the claims and motion(s)).

A.    **The Parties**

6.    Epes is a North Carolina corporation with its principal place of business in Greensboro, North Carolina. (2d Am. Compl. ¶ 1, ECF No. 45 [SAC].) Jason Bodford (Bodford) is the President of Epes. (Joint Appendix 1151 at ¶ 29, ECF Nos. 215–17 ["J.A."].)[2] Kristen Pettit (Pettit) has been employed by Epes since 2009, and she currently serves as its benefits and payroll manager. (J.A. 1143 at ¶ 1.) Hal Thompson Siler, Jr. (Siler) has been employed by Epes since 2005, and he currently serves as Epes' Executive Vice President of Finance. (J.A. 1142 at ¶ 2.)

7.    Defendant Anthony De Piante (De Piante) is a resident of Gaston County, North Carolina. (SAC ¶ 2; Defs.' Am. Answer to SAC & Countercl. ¶ 2, ECF No. 52 [Answer & Countercl.].)

8.    Defendant Jillian Caron (Caron) is a resident of Mecklenburg County, North Carolina. (SAC ¶ 3; Answer & Countercl. ¶ 3.)

9.    Defendant Brad Wiedner (Wiedner; and with De Piante and Caron, the Individual Defendants) is a resident of Mecklenburg County, North Carolina. (SAC ¶ 4; Answer & Countercl. ¶ 4.)

---

[2] The Joint Appendix submitted by the parties is expansive, and as a result, it is split across three separate record filings. (ECF Nos. 215–17.) However, for ease of review, the Court will cite to the Joint Appendix in the following method: (J.A. [ ] at [ ].) The Court will cite using the Joint Appendix number found in red at the bottom of each page.

10.    Defendant Noble Worldwide Logistics, LLC (Noble; and with the Individual Defendants, Defendants) is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina. (SAC ¶ 5; Answer & Countercl. ¶ 5.)

B.    **Acquisition of Login Logistics**

11.    Login Logistics, LLC (Login) was a "smaller international freight forwarder based in Charlotte[,]" North Carolina, (J.A. 0013–14 at ¶ 2), and "provided exclusively international logistics services, acting as liaison on the US side for freight either being imported or exported[,]" (J.A. 0323–24 at ¶ 2). Login was founded in 2006 by Steen Marcuslund (Marcuslund), who also served as the majority owner and president of Login. (J.A. 0323–24 at ¶¶ 2–3.)

12.    In 2015, De Piante began working for Login. (J.A. 0013 at ¶ 2.) De Piante was initially Login's Business Development and Export Manager, but later became Login's General Manager in 2016. (J.A. 0014 at ¶ 3.)

13.    Caron began working for Login in 2013 as an import agent, and later she was promoted to Finance Manager in 2015. (J.A. 0352 at ¶¶ 2–3.)

14.    In November 2016, Login entered into an Asset Purchase Agreement (the APA) with Epes. (J.A. 0324 at ¶ 3; *see* J.A. 1168–1208; J.A. 1144 at ¶ 3.) Through the APA, Epes "did not create a new entity or a separate company[,]" but instead "created a new division, the International Division, to distinguish it from Epes' traditional logistics business." (J.A. 0324 at ¶ 3.)

15. As a result of the Login acquisition, there were two divisions within Epes—the International Division and the Domestic Division, (J.A. 0015 at ¶ 6)—and all of Login's customers did business with Epes' International Division, (J.A. 0324 at ¶ 4).

16. Additionally, "[a]ll of Login's employees went to work for Epes after the APA," with all of them joining the International Division, (J.A. 0324 at ¶ 3), and Marcuslund became "the Managing Director of Epes' International Division[,]" (J.A. 0324 at ¶ 5). However, Marcuslund made sure it was clear to those at Epes that he "intended to retire from Epes on November 30, 2019, after [he] received [his] third earnout payment that [he] was due under the APA." (J.A. 0325 at ¶ 6.)

17. After Epes acquired Login, De Piante "was offered and accepted the position of General Manager of the International Division" of Epes, (J.A. 0325 at ¶ 6; *see also* J.A. 0458; J.A. 0014–15 at ¶ 5), and Caron "was offered and accepted the position of Finance Manager of the International Division[,]" (J.A. 0325 at ¶ 6; *see also* J.A. 0456; J.A. 1156–57 at ¶¶ 46, 51). Beginning 6 March 2017, Wiedner worked at Epes as an Export Agent. (J.A. 0569 at ¶ 3; J.A. 0619.)

### 1. Individual Defendants' Epes Employment Agreements

18. On 30 November 2016, Caron signed her employment agreement with Epes, (J.A. 1524–26); on 1 December 2016, De Piante signed his employment agreement with Epes, (J.A. 1213–16); and on 6 March 2017, Wiedner signed his employment agreement with Epes, (J.A. 0619–21), (together, the Employment Agreements).

19. The Employment Agreements contain identical provisions which govern the Individual Defendants' confidentiality and non-solicitation obligations. (J.A. 0619–

20 at ¶¶ 1–2; J.A. 1213–14 at ¶¶ 1–2; J.A. 1524–25 at ¶¶ 1–2.) The Employment

Agreements provide that

> For and in consideration of the employment of Employee by E[pes], on the date of this Agreement, the receipt of which is hereby acknowledged by Employee, Employee covenants and agrees that for the term of this Agreement, and for two (2) years following the end of Employee's employment with Employer, Employee will not, directly or indirectly, either for himself or for any other person, partnership, firm, corporation or company:
>
> > (a) solicit any "Prohibited Customer" to purchase "Competitive Services," within the United States, from a source other than the "Employer Group."
> >
> > (b) solicit any employee of any of the Employer Group with a base annual compensation in excess of $25,000, to leave his or her employment with the Employer Group.
> >
> > (c) For the purposes of this Agreement:
> >
> > (i) A "Prohibited Customer" shall mean a customer or potential customer (listings that exist in various sales pipelines within the Employer Group) of the Employer Group with whom the Employer Group has conducted business or is proposing business either:
> >
> > > a. during the term of Employee's employment with Employer, or
> > >
> > > b. within the two (2) year period prior to termination, for any reason, of Employee's employment with Employer;
> >
> > (ii) "Competitive Services" shall mean transportation, warehousing, logistics, or management services of the type provided by any of the Employer Group Companies; and
> >
> > (iii) "Employer Group" shall mean Epes Logistics Services, Inc., Epes Freight Management, Inc, Right Freight Solutions, Inc., Epes Carriers, Inc., and any and all other subsidiaries and affiliates of Employer, including those organized after the date of this Agreement.

The parties acknowledge and agree that given the nature of the Employer's business and the role of Employee in that business, the covenants and the associated time and territory restrictions, which were arrived at as a result of arms-length bargaining, are reasonable and appropriate for the protection of the Employer's legitimate business interests. The parties hereby waive the right to assert the unreasonableness of such restrictions. Employee acknowledges that he has been provided with the opportunity to have this Agreement reviewed by his legal or financial advisor and that he is satisfied with its terms.

(J.A. 0619–20 at ¶ 1; J.A. 1213–14 at ¶ 1; J.A. 1524–25 at ¶ 1.) De Piante negotiated an Agreement Addendum to his employment agreement, which "excluded Reichhold LLC 2 and Arysta Life Science North America LLC from the agreement as Prohibited Customers." (J.A. 1146 at ¶ 12; *see* J.A. 1216.)

20. As to their obligation of confidentiality, the Individual Defendants agreed that each

Recognizes and acknowledges that he will, during his employment by Employer, by privy to confidential, proprietary and non-public information of the Employer Group related to the business of the Employer Group and the Customers of the Employer Group, including, but not limited to, information relating to operations, logistics, transportation, supply, business plans, activities, proprietary and trade secret information, customer, carrier lists, or client lists, and other commercial aspects of its or their business ("Confidential Information"). Accordingly, Employee covenants that he will hold such Confidential Information in a fiduciary capacity for the benefit of the Employer Group and will not, either during his employment or at any time thereafter, either directly or indirectly, use for his own benefit or divulge, disclose or communicate Confidential Information to or for the benefit of any other person, firm, corporation, association or other entity. Further, upon request by Employer, Employee will promptly return to Employer, as its property, all records that are in Employee's custody, possession or control and that are related to such Confidential Information, in whatever form those records may exist.

(J.A. 0620 at ¶ 2; J.A. 1214 at ¶ 2; J.A. 1525 at ¶ 2.)

21. De Piante and Caron also executed a disclaimer and acceptance of the Employment Handbook of Epes, (the Handbook). (J.A. 1218–19; J.A. 1528.) The Handbook states, in relevant part, that

> It is the responsibility of each employee to ensure that any information gained by virtue of employment is not improperly disclosed to outsiders or fellow employees. No Company-related records or information may be removed or discussed without proper authorization (except in the ordinary course of performing duties on behalf of the Company). Information may include, but not be limited to: documents, notes, files, records, oral information, computer files or similar materials. Disclosing confidential information regarding a customer or Company business is a direct violation of Company policy and will result in appropriate disciplinary action, up to and including termination.
>
> Employees who terminate employment with the Company, for any reason, shall not take or copy documents containing confidential information.

(J.A. 1227.) The Handbook also provides that

> Employees of the Company are expected to devote their time to the Company's interest during regular and expected hours each day so that they can fully carry out their responsibilities and duties as assigned. Employees should avoid outside commitments, which would impair the effective performance of their duties, either in the form of time demands or establishment of relationships, which run contrary to their obligations to the Company. Permission is required prior to undertaking any secondary employment outside the Company. Requests for permission should be addressed to Executive level for approval to ensure there is no conflict of interest.

(J.A. 1229.) Throughout their employment at Epes, De Piante and Caron both "received additional training on Epes' policies as they relate to confidentiality, ethics, and security." (J.A. 1146 at ¶ 18; J.A. 1158 at ¶ 53; *see also* J.A. 1262–72, 1536–50.)

C. **Management and Operation of the International Division**

22. The International Division of Epes was located in Charlotte, North Carolina, while Epes' Domestic Division, main headquarters, and management was located in Greensboro, North Carolina. (J.A. 0354 at ¶ 6.)

### 1. De Piante's Responsibilities & Authority at Epes

23. Epes wanted De Piante to serve "as Epes' Qualifying Individual ('QI') for the purpose of Epes obtaining—and maintaining—its Ocean Transportation Intermediary ('OTI') License from the Federal Maritime Commission ('FMC')." (J.A. 1147 at ¶ 20.) Without an OTI License, "Epes would have been unable to handle the forwarding of international ocean shipments—a significant portion of Epes International Division's revenue." (J.A. 1147–48 at ¶ 20.)

24. On 2 November 2016, Jennifer Cox (Cox), an executive coordinator at Epes, sought Marcuslund's guidance as to a question regarding the Qualifying Individual for the OTI license and a request to "attach proof of position held." (J.A. 0099–100.) Marcuslund responded, stating "that one is a challenge–you somehow need to appoint [De Piante] as Officer–create a position like Chief Ocean Officer." (J.A. 0099.) Marcuslund later advised that Cox "need[ed] to prepare some minutes where [De Piante] is Chief Ocean Officer." (J.A. 0098.)

25. Thereafter, on 7 November 2016, Cox again sought Marcuslund's advice when an OTI analyst sought more information regarding De Piante's position as Chief Ocean Officer. (J.A. 0095.) Marcuslund advised that De Piante needs to be "an officer to act as Qualified Individual[,]" noting that it "doesn't mean he has a say and

no signature right," but instead suggested that Epes "just write some minutes and add him as Officer (Chief Ocean Officer), for this purpose only." (J.A. 0095.)

26. On 1 November 2016, prior to De Piante's employment with Epes, De Piante was appointed as "Chief Ocean Officer" of Epes. (*See* J.A. 0103.) This appointment was executed by Bodford, and his father, Al Bodford, both as Shareholders and Directors of Epes. (J.A. 0104; *see* J.A. 0487 (when asked when Epes created the position of Chief Ocean Officer, Epes provided that "[i]t was created in November of 2016.").)

27. Thereafter, on 7 December 2016, Cox emailed Bodford, indicating that De Piante's title of Chief Ocean Officer was questioned by an OTI analyst "since his title was not a 'normal title like Vice President, etc.'" (J.A. 0111.) She represented to Bodford that the OTI analyst suggested Epes "could change [De Piante's] title to VP (or something like that) on all sections in the application and then attach a copy of minutes stating there was a meeting to change his title." (J.A. 0111; *see also* J.A. 0345 at 135:19–22 (providing that Siler understood that "the Federal Maritime Commission did not recognize the title 'chief ocean officer' as a legitimate title and required [Epes] to change [De Piante's] title").)

28. Thereafter, it appears that on 7 December 2016, the same day De Piante signed his employment agreement with Epes, he was appointed as Vice President of Epes. (J.A. 0113.) As a result, "[t]he title of vice president replaced the title of chief ocean officer." (J.A. 0488 at 59:10–11.) However, De Piante's employment agreement

listed his position as "General Manager;" not as Chief Ocean Officer or Vice President. (*See* J.A. 0106.)

29.     De Piante was later listed as the Vice President of Epes on the application for Epes' OTI License. (*See* J.A. 0841.) Thereafter, Epes obtained the OTI License, which listed De Piante as both the Qualifying Individual of Epes and Vice President. (J.A. 0863.) De Piante also referred to himself as Vice President in an email dated 1 May 2018, explaining that his "title of 'General Manager' is in reference to [his] functions within the Charlotte Branch Office [of Epes] while [his] title of Vice President (which is still correct) refers to [his] functions within Epes Logistics Service, Inc." (J.A. 1293.) However, De Piante was never listed as a company official or officer on Epes' tax returns during his tenure at Epes. (*See* J.A. 0766–77.)

30.     Through his role as General Manager of the International Division, De Piante reported directly to Marcuslund. (J.A. 0326 at ¶ 10.) In fact, Marcuslund represented to Bodford that De Piante and Caron "manag[ed] the company day to day." (J.A. 0996; *see also* J.A. 0464 at 154:6–10 (where Marcuslund confirmed that he had told Bodford numerous times that De Piante was "basically running the international division.").)

31.     However, according to Marcuslund, while De Piante "ran the day-to-day operations for a portion of the International Division and had the ability to have run the entire division, there was a large portion of the International Division that he had little to no involvement with." (J.A. 0326 at ¶ 11.) "There were a number of International Division customers with whom De Piante had little to no involvement,

either with the customer itself or with the employees who handled the customer accounts." (J.A. 0326 at ¶ 11.)

32. De Piante never represented the International Division at any Epes leadership meetings, and in fact, never attended an Epes leadership meeting in any capacity. (J.A. 0024 at ¶ 39; J.A. 0542 at 311:11–13.)

33. The extent of De Piante's authority as General Manager of the International Division of Epes is heavily disputed. (*Compare* J.A. 1151–53 at ¶¶ 28–36; *with* J.A. 0016–0021 at ¶¶ 10–30.)

### 2. Caron's Responsibilities & Authority at Epes

34. As Finance Manager of the International Division, "[Caron] was charged with keeping up with the various accounting matters for the International Division and reporting that information to Epes' accounting department [ ] each month." (J.A. 0355 at ¶ 9.) Caron also "kept the books and accounts for Login post-APA and for a sister company of Login, Login FMS, LLC [ ] and FreightPal, Inc." (J.A. 0354 at ¶ 7.) Since Marcuslund had an earnout upon retirement based on "certain projected financial targets of the International Division[,]" Marcuslund paid Caron to "keep a running tally of the International Division's financial performance and to assist him in calculating the earnout he was entitled to receive under the APA." (J.A. 0354 at ¶ 7.) Epes was "aware of these activities and the information that [Caron] had in order to prepare the calculations" for Marcuslund. (J.A. 0354 at ¶ 7.)

35. Caron was also responsible for sending a series of emails to Epes' management team at the beginning of each month "which contained all of the

financial information related to the International Division for the preceding month." (J.A. 0355 at ¶ 10; *see, e.g.*, J.A. 0380–0438.) After sending those emails, Caron "would usually have a follow-up phone call with Siler or Kern where they asked questions and/or requested additional information, which [Caron] answered and/or provided to them." (J.A. 0356 at ¶ 11.) "In between these monthly emails [Caron] also set up auto-generated weekly reports that provided various financial information to those same people[.]" (J.A. 0356 at ¶ 12.)

36.    Similar to De Piante, the extent of Caron's authority as Finance Manager at Epes is heavily disputed. (*Compare* J.A. 1157–59 at ¶¶ 51–60; *with* J.A. 0357–60 at ¶¶ 14–27.)

### 3.    Internal Processes and Procedures

37.    As to the accounting and customer information for Epes' International Division, it "was always maintained separately from Epes' other accounting and customer information," which De Piante and Caron were familiar with and knew "the specialized accounting platform known as CargoWise on which Epes' International Division depended." (J.A. 1145 at ¶ 8.)

38.    As to the sales process, it is typical in the international freight forwarding industry to employ sales representatives, who are charged with bringing "customers to their company for a first shipment, but whether or not a customer will keep returning to the same company for subsequent shipments depends mostly on the quality of service provided by the operations employees in handling the customer's business." (J.A. 0785 at ¶ 5.) In fact, "customers rarely agree to long-term contracts

with logistics companies, as it is in their interest to remain flexible in order to find the best service and competitive prices available in the market." (J.A. 0785 at ¶ 5; *see* J.A. 0781 at 70:17–21 ("each shipment was its own individual transaction that you would perform the duties you had to and then at the conclusion of it you would expect payment[.]"); J.A. 0782 at 71:6–10 (providing that business was "contingent on them reaching out again for the next quote.").)

### D. Events at Epes Leading to Noble's Creation

39. From the moment Login was acquired by Epes, "Marcuslund made it clear that he intended to retire after receiving his third and final earnout payment, which would have been roughly the end of November 2019." (J.A. 0028 at ¶ 51.) De Piante "believed that [he] should be the natural successor to lead the International Division after Marcuslund's retirement" and Marcuslund agreed. (J.A. 0028 at ¶ 51.)

40. Marcuslund passed along several comments to De Piante and Caron that he attributed to Bodford or others from Epes' management, which gave the impression that Epes' management did not believe Caron was "all that valued" at Epes. (J.A. 0028 at ¶ 51; J.A. 0361 at ¶ 32.) All of this led De Piante and Caron to question their futures at Epes once Marcuslund retired, and "De Piante and [Caron] discussed the possibility of going to work for another company or starting [their] own company." (J.A. 0361 at ¶ 32; J.A. 0028 at ¶ 51.)

41. As Marcuslund approached retirement, De Piante and Caron discussed future options "more frequently and even took some preliminary steps to figure out a timeline of how things might happen." (J.A. 0361 at ¶ 32; J.A. 0028 at ¶ 51.)

42. In September 2018, Bodford and De Piante "had a falling out[,]" (J.A. 0028 at ¶ 52), regarding a customer that De Piante brought to Epes from Login, a customer relationship that De Piante believed a Domestic Division Epes employee ruined, (*see* J.A. 0221–0226). This falling out with Bodford ultimately led to De Piante's decision that he "did not want to remain with Epes, and [his] discussions with Caron about starting [their] own company accelerated." (J.A. 0028 at ¶ 52; *see* J.A. 0362 at ¶ 33.)

### E. Noble's Creation and Related Conduct

43. In November 2018, De Piante and Caron founded Noble, with each holding a fifty percent ownership interest. (J.A. 0028 at ¶ 52; J.A. 0362 at ¶ 33.) De Piante served as Noble's President, and Caron served as Noble's Controller. (J.A. 0028 at ¶ 52; J.A. 0362 at ¶ 33.)

44. Between Noble's inception and Caron's departure from Epes on 28 February 2019, she "took various steps to get Noble up and running, including setting up bank accounts and submitting applications to do business." (J.A. 0362 at ¶ 34.) Specifically, "Caron and [De Piante prepared] to get Noble completely up and running, including getting insurance and bonding, submitting Noble's application for an OTI license, submitting information to Paragon Bank for a potential line of credit and hiring its first employee in its Charlotte location[.]" (J.A. 0029 at ¶ 54; *see* J.A. 0362 at ¶ 36.)

#### 1. Purchase of Computers

45. On 11 December 2018, Noble received an invoice, billed to Noble and sent to Noble's principal address, from T3 Computer Services for $2,418.63 for what

appears to be two "Latitude 3590 BTX" laptop computers and other "[m]iscellaneous items." (J.A. 1379.) On 12 December 2018, a check was sent to T3 Computer Services drawn on Epes' checking account—not Noble's—for $2,418.63, signed by De Piante. (J.A. 1381; J.A. 0559 at 100:15–22.)

46. De Piante represents that these computers were not used by Noble, and instead offers that they "were purchased to use for Epes' business[,]" (J.A. 0560 at 102:4–8), though Pettit, Epes' benefits and payroll manager, testified that those computers "were not used for Epes" because "all of Epes' computers c[o]me from [Epes'] IT department[,]" (J.A. 1018 at 131:8–13).

47. Additionally, on 17 January 2019, Noble received a second T3 Computer Services invoice for what appears to be two "Crucial 4GB" memory storage products and one "trip charge[,]" with a notation indicating that they "[i]nstalled RAM in [De Piante] and [Caron's] laptop[.]" (J.A. 1380.)

48. As of the date of the Hearing on the Motions, no party to this action admits to knowing where the computers at issue are located. (*See, e.g.,* J.A. 0560 at 104:5–105:15.)

## 2. Continued Access to, and Use of, Epes' Information

49. After terminating her employment with Epes, Caron, with Epes' permission, "continued to handle Login and LoginFMS' books and accounting" by remotely accessing "Epes' Cargowise platform, which also contained the information for Login and LoginFMS." (J.A. 0362 at ¶ 35.) Epes was aware of this work by Caron, and on 21 February 2019, Epes "had [Caron] sign an agreement to handle this work

as an independent contractor." (J.A. 0362 at ¶ 35; *see* J.A. 0440–41.) Notably, Caron's agreement to work as an independent contractor did not contain any confidentiality obligation. (*See* J.A. 0440–41.) As a result, Caron continued to utilize Epes' computer system after her departure from Epes and during her time as an independent contractor. (*See* J.A. 1586–1631.)

50. Caron "put together a document that identified various customers of Epes' International Division and the revenue, costs and gross profit for those customers from the preceding years." (J.A. 0367 at ¶ 53; *see* J.A. 0453–54.) Caron "knew the identity of many of the customers that [she] included on the list from [her] days at Login," and she obtained this information "from Epes' records that [she] had collected as part of [her] activities from Login, LoginFMS and Marcuslund." (J.A. 0367 at ¶ 53.)

51. Specifically, Caron utilized a list of Epes' customers to present projections for Noble's anticipated business to Paragon Bank, a bank from which Noble applied to borrow funds for operations. (*Compare* J.A. 1443–45, *with* J.A. 0453–54.) On 26 February 2019, Caron submitted the information she had gathered to Paragon Bank in the form of a business precis as part of the bank's request for information regarding Noble's application for a line of credit. (J.A. 0368 at ¶ 53; *see* J.A. 0450–54.)

52. Caron admits that the figures provided in the business precis were pieces of information she acquired from Epes, (J.A. 0949 at 197:6–11), and at the time she disclosed this information to Paragon Bank to obtain financing for Noble, she did not

have the permission of Epes to share, or use, such information, (J.A. 0950 at 202:2–5).  As a result of Caron's efforts, "Paragon did provide a $100,000 line of credit, but not until some time in May 2019."  (J.A. 0368 at ¶ 53.)

53.    Additionally, Caron and De Piante were in similar communication during the same period of time with Roanoke Trade in an attempt to obtain financing.  (*See* J.A. 1070–73.)

### 3.    Epes Employees Join Noble

54.    Wiedner worked at Epes from 6 March 2017 until his resignation on 31 May 2019 in its International Division doing export customer service.  (J.A. 0569 at ¶ 3.) Following Wiedner's resignation from Epes, he joined Noble on 3 June 2019. (J.A. 0568 at ¶ 2; J.A. 0364 at ¶ 41.)

55.    When applying to Noble, Wiedner initially emailed Noble's HR email account, indicating that he "found [Noble's] job posting on Charlotte Logistics Connection on LinkedIn[,]" and felt he would "be a great fit for th[e] position." (J.A. 1852.)  Wiedner testified that he was not aware that De Piante or Caron "were involved or affiliated with Noble when [he] applied for a job at Noble."  (J.A. 0573 at ¶ 18.)  However, the same day he submitted his original application, Wiedner emailed Caron at her Noble email address, through which he indicated he received an error message in response to his initial submission, and attached his resume for consideration. (J.A. 1849.)  Additionally, Wiedner continued to utilize Epes' computer system after his departure from Epes.  (*See* J.A. 1633–51.)

56. Tammy Russell (Russell) began work for Epes after the APA was entered, and worked there from 1 December 2016 until 16 September 2019, when she submitted her resignation to Marcuslund by email. (J.A. 0742; J.A. 1893.) Thereafter, Russell joined Noble. (*See* J.A. 1021.)

57. Steve Posson (Posson) "worked for Epes . . . from August 2017 until November 2019 as a sales executive in its International Division." (J.A. 0784 at ¶ 3.) Following the end of his employment with Epes, he joined Noble in February 2020, where he currently works as an independent contractor sales representative. (J.A. 0784 at ¶ 2.)

58. Matthew Cook (Cook) began work for Epes from 1 December 2016 until 3 January 2020, when Cook was terminated from Epes by Carlos Sanchez. (J.A. 0790 at ¶ 4.) Thereafter, in July 2020, Cook joined Noble where he currently works "as an international import logistics operator." (J.A. 0789 at ¶ 2.)

### 4. Noble Seeks to Expand Client Base

59. Epes and Defendants have identified twenty-eight businesses "who were doing business with Epes' International Division prior to Noble's founding (in November 2018) and who later started to use Noble to perform international freight forwarding services[.]" (J.A. 0032 at ¶ 61; *see also* J.A. 0446.) These twenty-eight businesses are referred to by the parties as the "Disputed Customers" for purposes of the Motions. (J.A. 0032 at ¶ 61; *see also* J.A. 0446.)

60. After De Piante left Epes, he admits that he "immediately began competing with Epes, not just for business from those companies that used Epes for

international freight forwarding, but with other companies as well." (J.A. 0032 at ¶ 63.)

### a. AWA

61. In February 2019, after Caron left Epes to work at Noble, but before De Piante resigned from Epes, De Piante "was contacted by AWA concerning a shipment for Bayer Crop Science." (J.A. 0029 at ¶ 55.) AWA notified De Piante that "its employees had noticed a shipment for Bayer had been sitting on a dock in Chicago for an extended period of time, and AWA knew that Epes had previously handled shipments for Bayer[.]" (J.A. 0029 at ¶ 55.) AWA then asked whether De Piante was aware of the delayed shipment and whether any assistance was needed. (J.A. 0029 at ¶ 55.)

62. AWA was not a customer of Epes, but instead was a vendor whom Epes occasionally hired to perform freight forwarding services Epes could not perform. (J.A. 0029 at ¶ 55.)

63. De Piante was able to bring this opportunity to Epes, which from De Piante's perspective, allowed Epes "to receive thousands of dollars that it otherwise would not have received simply by replacing its competitor as the freight forwarder handling the shipment." (J.A. 0030 at ¶ 56.) De Piante then arranged for Epes to retain AWA "to take over the shipment and get it shipped via air to its foreign port." (J.A. 0030 at ¶ 57.)

64. AWA also needed to "repackage all of the product for regulatory-related purposes . . . and prepare it to be loaded onto the airline in the most efficient manner

possible." (J.A. 0030 at ¶ 57.) This is done through creating a "cookie sheet," which is essentially "a way to package freight for transportation to maximize airline space while still complying with airline weight and volume and balance requirements." (J.A. 0030 at ¶ 57.) However, "[l]oad planning cookie sheets is extremely time consuming," as there are many regulations that must be reviewed and confirmed before the cargo is loaded. (J.A. 0030 at ¶ 57.) Cookie sheets "are typically created as part of the warehousing activities of a shipment, since the product needs to be loaded in a particular manner before the entire package is shrink wrapped." (J.A. 0030 at ¶ 57.)

65. It was De Piante's understanding that Marcuslund "had never allowed his company to create 'cookie sheets' and he continued that same prohibition while at Epes." (J.A. 0030 at ¶ 57.) De Piante believed that "[Marcuslund] would not approve of Epes performing the task." (J.A. 0030 at ¶ 57.) However, Epes represents that "it has, in fact, previously managed shipments utilizing 'cookie sheets'," as this is a "commonly used method for transporting cargo in the air freight industry." (J.A. 1162 at ¶ 68.)

66. As a result, De Piante, who "knew how to create cookie sheets from [his] earlier work in freight forwarding[,]" (J.A. 0030 at ¶ 57), "offered to assist AWA in creating the cookie sheets, but made it clear that the services were being performed by Noble so that Epes would have no potential liability if there were problems with the cookie sheets[,]" (J.A. 0031 at ¶ 58).

67. Noble completed this work for AWA relating to the cookie sheets, (J.A. 0031 at ¶ 58), and as a result, "Noble billed AWA for the work performed in creating the cookie sheets as 'consultation services'," (J.A. 0031 at ¶ 59; *see* J.A. 1098–1101). Thereafter, AWA billed Epes for the services Noble performed, along with the other services AWA, or its other vendors, performed as part of the shipment process, in the amount of $44,642.40. (J.A. 1161 at ¶ 67; J.A. 0031 at ¶ 59.) Within days of AWA receiving the payment from Epes, AWA remitted the exact same amount to Noble. (J.A. 1161 at ¶ 67.) Epes then billed Bayer, the company which this transaction was meant to benefit, for all of the services which were billed by AWA. (J.A. 1161 at ¶ 67; *see* J.A. 1104.)

### b. LRGistics, LLC

68. Justin Byzcek (Byzcek) is the "owner of Woodczek, LLC and a part owner in LRGistics, LLC, and has been since their founding in 2011 and 2016, respectively." (J.A. 0554 at ¶ 2.) Byzcek has known Caron and De Piante for over nine years. (J.A. 0555 at ¶ 3.) Woodczek, LLC and LRGistics, LLC "have never been customers of Epes[,]" (J.A. 0554 at ¶ 2), and LRGistics, LLC is not a Disputed Customer, (*see* J.A. 0446).

69. In early 2019, Caron inquired as to whether Woodczek, LLC or LRGistics, LLC "had any accounting/bookkeeping work that she could perform as Noble." (J.A. 0555 at ¶ 4.) As a result, for two to three months in early 2019, "Caron worked on accounting/bookkeeping matters for both Woodczek and LRGistics, primarily reconciling and getting the books of each company in order." (J.A. 0555 at ¶ 4.)

Byzcek "agreed to pay Noble for this work because [he] knew that [ ] Caron and [ ] De Piante were just starting Noble and were in need of business revenue." (J.A. 0555 at ¶ 5; *see* J.A. 1661 (evidencing the amounts paid by LRGistics, LLC to Noble).)

70.     Later in 2019, Caron asked whether Woodczek, LLC or LRGistics, LLC had any work that Russell could perform. (J.A. 0555 at ¶ 6.) Caron represented to Byzcek "that [ ] Russell had recently left Epes but because of a recently filed lawsuit, it was unclear whether Noble would have enough work to keep [ ] Russell busy full time. (J.A. 0555 at ¶ 6.) Byzcek determined that Woodczek, LLC "did have work Ms. Russell could perform, along with performing work for Noble." (J.A. 0555 at ¶ 6.) Although Woodczek initially paid Russell for the work performed, "Noble eventually repaid Woodczek for the payments made to [ ] Russell." (J.A. 0555 at ¶ 6.)

### c.     Bayer Crop Science LP

71.     Bayer Crop Science LP is a Disputed Customer. (J.A. 0446.)

72.     On 28 June 2019, De Piante sent an email from his Noble email account to a Bayer employee, asking that she "[p]lease note [his] NEW email address" and to "only use this one going forward[.]" (J.A. 1458.) On 3 July 2019, De Piante sent an email to another Bayer employee, attaching "documents pertaining to Noble" and inquiring as to whether they needed any more information. (J.A. 1123.) De Piante testified that these emails were to bring business to Noble. (J.A. 0832 at 285:4–10.)

73.     Thereafter, De Piante sent two follow-up emails, indicating that he had not "heard anything" from either recipient and asked them to give him a call. (J.A. 1658.)

### d. Far Logistics

74. De Piante represents that "[o]ne of th[e] Disputed Customers from whom Noble won significant business was Far Logistics." (J.A. 0033 at ¶ 63; *see* J.A. 0446.)

75. Far Logistics is a "foreign international freight forwarding agent [which is] located in another country." (J.A. 0033 at ¶ 65.) Far Logistics operated in a similar manner to Epes. (J.A. 0033 at ¶ 65.) "These foreign agents would become customers of Epes' International Division because the agent had their own customers who had purchased product that has been manufactured in the United States but need the product delivered to a location in a foreign country." (J.A. 0033 at ¶ 65.) In these situations, "the foreign agent would need a freight forwarding agent located in the United States to handle all the logistics needed to get the product from its US location to a port located in the United States so that it could then be delivered overseas." (J.A. 0033 at ¶ 66.) All the United States carrier's duties "ended at the US shoreline." (J.A. 0034 at ¶ 67.)

76. After leaving Epes, De Piante "notified Dave Payne of Far Logistics that [he] had started [his] own company and would likely be leaving Epes." (J.A. 0034 at ¶ 70.) De Piante "had a long relationship with Payne, one that went back before [he] started working at Epes Logistics." (J.A. 0034 at ¶ 70.) Dave Payne had expressed that he would want to "continue to work with [De Piante] wherever [De Piante] went, and even suggested that other Far Logistics locations would likewise want to work with [De Piante]." (J.A. 0034 at ¶ 70; *see* J.A. 0186–0195 (text messages

between De Piante and Dave Payne related to how a business relationship between Noble and Far Logistics might look).)

77.     De Piante later texted Dave Payne to inform him that Epes "hired this guy Carlos to replace [Marcuslund].  He will very probably be reaching out to all agents for an introduction asking for business. . . . Can you please let the Far [ ] team[ ] know to be aware and best thing to do is just ignore him." (J.A. 1456; *see* J.A. 0831 at 279:1–4 (De Piante stating that he sent this text because he thought it was "the best thing to do").)  Seemingly pursuant to this directive, Dave Payne informed Carlos Sanchez, by email dated 28 September 2019, that the business handled by Epes in the past "will not be coming back your way," indicating that it had "nothing to do with the service we received from EPES but is following a change to one of our network partners."  (J.A. 1896.)  Dave Payne then forwarded this email to De Piante. (J.A. 1896.)

### III.     PROCEDURAL BACKGROUND[3]

78.     Epes initiated this action on 1 October 2019 with the filing of its Verified Complaint, (ECF No. 5).

79.     On 27 January 2022, Epes filed its Second Amended Complaint, asserting the following nine claims against Defendants: (1) Breach of Contract as to Individual Defendants (Count One), (SAC ¶¶ 61–66); (2) Injunctive Relief as to Individual Defendants related to their alleged confidentiality obligations (Count Two),

---

[3] The Court sets forth only those portions of the procedural history relevant to its determination of the Motions.

(SAC ¶¶ 67–71); (3) Breach of Fiduciary Duty as to De Piante and Caron (Count Three), (SAC ¶¶ 72–78); (4) Unfair and Deceptive Trade Practices as to all Defendants (Count Four), (SAC ¶¶ 79–84); (5) Aiding and Abetting as to all Defendants (Count Five), (SAC ¶¶ 85–89); (6) Tortious Interference with Contract as to all Defendants (Count Six), (SAC ¶¶ 90–97); (7) Tortious Interference with Customer Relationships as to all Defendants (Count Seven), (SAC ¶¶ 98–106); (8) Civil Conspiracy as to all Defendants (Count Eight), (SAC ¶¶ 107–10); and (9) Respondeat Superior as to Noble (Count Nine), (SAC ¶¶ 111–14).

80.    On 1 March 2022, Defendants filed their Answer to Second Amended Complaint, (ECF No. 47), and thereafter filed their Amended Answer to Second Amended Complaint and Counterclaim (Counterclaim) on 2 May 2022, (*see* Answer & Countercl.).   Defendants assert by way of counterclaim a claim for declaratory judgment concerning the interpretation and enforceability of the non-solicitation covenants in the Employment Agreements at issue (Counterclaim One), (Answer & Countercl. ¶¶ 135–38).

81.    On 3 October 2023, Epes voluntarily dismissed without prejudice Count One for breach of contract to the extent it is based on "Individual Defendants' breaches of Paragraph 1 of their respective Employment Agreements as described in paragraph 62 and 63" of the Second Amended Complaint.   (Partial Vol. Dismissal at 1, ECF No. 157.)

82. Epes seeks affirmative summary judgment on two discrete legal issues: (1) that De Piante "owed a fiduciary duty to Epes[,]" and (2) that "De Piante breached that fiduciary [duty.]" (Pl.'s Mot. 1.)

83. Defendants seek summary judgment in their favor as to "all of [Epes'] claims remaining in the Second Amended Complaint[,]" as well as affirmative summary judgment in their favor as to Counterclaim One. (Defs.' Mot. 1.)

84. Following full briefing, the Court held a hearing on the Motions on 12 November 2024 (the "Hearing") at which all parties were represented through counsel. (*See* ECF No. 244.)

85. The Motions are ripe for resolution.

## IV. LEGAL STANDARD

86. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citation omitted). " 'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' and means 'more than a scintilla or a permissible inference.' " *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 8 (2018) (quoting *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 335 (2015)).

87. The moving party bears the burden of showing that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563 (2008). The movant may make the required showing by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83 (citations omitted).

88. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a prima facie case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85 (2000) (citation omitted). The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83 (citation omitted). However, the nonmovant(s)

> may not rest upon the mere allegations or denials of [their] pleading, but [their] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant].

N.C.G.S. § 1A-1, Rule 56(e).

89. "For affirmative summary judgment on a party's own claim, the burden is heightened." *Futures Grp. v. Brosnan*, 2023 NCBC LEXIS 7, at **4 (N.C. Super. Ct. Jan. 19, 2023); *see Brooks v. Mount Airy Rainbow Farms Ctr., Inc.*, 48 N.C. App. 726,

728 (1980). The movant "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985); *accord Kidd v. Early*, 289 N.C. 343, 370 (1976). Consequently, "rarely is it proper to enter summary judgment in favor of the party having the burden of proof." *Blackwell v. Massey*, 69 N.C. App. 240, 243 (1984).

## V. ANALYSIS

90. The Court first addresses Count Three of Plaintiff's Second Amended Complaint for breach of fiduciary duty brought against De Piante and Caron, a claim for which both Motions request summary judgment, though in different respects. The Court then considers the remainder of Defendants' Motion.

### A. Count Three: Breach of Fiduciary Duty Against De Piante & Caron

91. First, Defendants seek summary judgment on Count Three for breach of fiduciary duty brought against De Piante and Caron, while Epes seeks offensive summary judgment on two discrete legal issues related to Count Three: (1) whether De Piante owed any fiduciary duties to Epes; and if so, (2) whether De Piante breached those duties.

92. "To establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339 (2019).

93. It is axiomatic that "[f]or a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651 (2001). "North Carolina recognizes two types of fiduciary relationships: de jure, or those imposed by operation of law, and de facto, or those arising from the particular facts and circumstances constituting and surrounding the relationship." *Hager v. Smithfield E. Health Holdings, LLC*, 264 N.C. App. 350, 355 (2019).

94. Epes has asserted Count Three against De Piante and Caron, alleging that De Piante owed a de jure fiduciary duty to Epes, while De Piante and Caron both owed de facto fiduciary duties to Epes. (SAC ¶¶ 73–74.) The Court first addresses whether De Piante owed a de jure or de facto fiduciary duty, or both, to Epes, and then turns to whether Caron owed a de facto fiduciary duty to Epes.

### 1. De Jure Fiduciary Duty as to De Piante

95. Epes contends that it is entitled to offensive summary judgment on the issue that De Piante had a de jure fiduciary relationship with Epes, because he "served as a Vice President of Epes—a title he confirmed, affirmed, and even explained—and because he was duly appointed by the Board of Directors consistent with Epes' Bylaws[.]" (Pl.'s Br. Supp. Pl.'s Mot. 21, ECF No. 227 ["Pl.'s Br. Supp."].) De Piante, in turn, seeks summary judgment as to Count Three, arguing that the "undisputed facts show that De Piante was merely an employee" of Epes, which is "not enough to create a de jure relationship" under North Carolina law. (Br. Opp. Pl.'s Mot. 7, ECF No. 223 ["Defs.' Br. Opp."].)

96. "In North Carolina, a fiduciary duty can arise by operation of law (de jure)." *Lockerman*, 250 N.C. App. 631, 635 (2016) (citing *Abbitt v. Gregory*, 201 N.C. 577, 598 (1931)). Principal and agent relationships are an example of a legal relation giving rise to de jure fiduciary duties. *Id.*; *see also BDM Invs. v. Lenhil, Inc.*, 2014 NCBC LEXIS 6, at *21 (N.C. Super. Ct. Mar. 20, 2014) (finding summary judgment to be inappropriate when there was a genuine dispute of material fact as to whether an agency relationship existed between the parties).

97. By statute, a corporate officer must discharge his duties "(1) [i]n good faith; (2) [w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) [i]n a manner he reasonably believes to be in the best interest of the corporation." N.C.G.S. §§ 55-8-42(a)(1)–(3). "A corporation can act only through its agents, which include its corporate officers." *Ellison v. Alexander*, 207 N.C. App. 401, 414 (2010) (quoting *Woodson v. Rowland*, 329 N.C. 330, 344 (1991)) (internal quotations omitted); *see also Meiselman v. Meiselman*, 58 N.C. App. 758, 775 (1982) (providing "[o]fficers and directors shall be deemed to stand in a fiduciary relation to the corporation and to its shareholders" (citation omitted)).

98. Epes contends "De Piante served as a Vice President of Epes–a title he confirmed," resulting in De Piante owing a de jure fiduciary duty to Epes. (Pl.'s Br. Supp. 21.) Epes relies on two main facts to support its contention that De Piante was an officer of Epes—his appointment by Epes' Board of Directors to serve as Vice

President and his statements in an email to the Federal Maritime Commission where he stated that he was Vice President of Epes. (Pl.'s Br. Supp. 2, 20.)

99. De Piante, in opposition to Epes' motion, argues it is clear that he was merely an employee of Epes through his role as General Manager of the International Division. (Defs.' Br. Opp. 6–8.) De Piante contends that any "minutes" Epes relies on to evidence that De Piante was appointed as Chief Ocean Officer were "from a purported November 1, 2016 Board meeting that never actually happened." (Defs.' Br. Opp. 9.) Further, De Piante argues it is implausible that he was appointed as Chief Ocean Officer on 1 November 2016, as "it would be another month (December 1, 2016) before Epes offer[ed] De Piante employment as its 'General Manager' [ ] or even closed on the APA itself." (Defs.' Br. Opp. 9.) Additionally, there has been evidence presented that De Piante was never listed as an officer of Epes on official tax documents or on Epes' filings with the North Carolina Secretary of State. (*See* J.A. 0766–77.)

100. It appears nearly all of the facts surrounding De Piante's alleged role as a de jure fiduciary of Epes, and his supposed appointment as Vice President of Epes, are heavily disputed by the parties. Based on the evidence before the Court at this time, it is clear a genuine issue of material fact exists as to whether De Piante was appointed as Vice President—either in accordance with Epes' Bylaws or in actuality—and as a result, whether any de jure fiduciary relationship exists between De Piante and Epes. While it appears based on the record before the Court that De Piante acted as the General Manager of the International Division of Epes, there

is also evidence that tends to show that De Piante held himself out as the Vice President of Epes on at least one occasion.

101. As a result, a genuine issue of material fact remains as to whether De Piante was an acting Vice President of Epes, which would in turn support a determination that De Piante was a de jure fiduciary of Epes. That question is one which a jury must answer.

102. Therefore, the Court hereby **DENIES** the Motions in part as to Count Three as they relate to De Piante's alleged de jure fiduciary duty to Epes. As a result, the Court need not reach the issue of whether Epes is entitled to affirmative summary judgment on the issue of whether there was any breach of De Piante's alleged fiduciary duty owed to Epes, and this issue related to Count Three proceeds to trial accordingly.

### 2. De Facto Fiduciary Duty as to De Piante & Caron

103. Epes contends that De Piante also had a de facto fiduciary relationship with Epes, as "De Piante was in charge of Epes' international division[,]" "all operations and sales personnel in the division reported to De Piante[,]" and De Piante had certain responsibilities, which "in the aggregate, make it clear that De Piante was a de facto fiduciary of Epes in addition to being a de jure fiduciary." (Pl.'s Br. Supp. 22–23.) Epes also contends that Caron was a de facto fiduciary of Epes, as she "exercised substantial control over Epes' International Division[,]" and while not being formally identified as such, "Caron operated as the Chief Financial Officer of Epes' International Division." (Pl.'s Br. Opp. Defs.' Mot. 23, ECF No. 228 ["Pl.'s Br. Opp."].)

104. North Carolina courts have recognized that a fiduciary relationship can be created by the surrounding facts or circumstances—giving rise to a de facto fiduciary relationship. *Lockerman*, 250 N.C. App at 635–37. "De facto relationships are less immediately identifiable, as '[c]ourts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded.'" *Hager,* 264 N.C. App. at 354–55 (citing *Abbitt*, 201 N.C. at 598). To be sure, "[t]he standard for finding a de facto fiduciary relationship is a demanding one: Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *Id.* at 572 (citing *Lockerman*, 250 N.C. App. at 636) (internal quotations omitted); *see also Dalton,* 353 N.C. at 651–52 (holding that "the nature of virtually all employer-employee relationships[,] without more . . . [is] inadequate to establish [an at-will employee's] obligations as fiduciary in nature").

105. In the employment context, the mere existence of an employer-employee relationship is insufficient to give rise to a fiduciary duty. *See id.* at 652 (quoting *King v. Atl. Coast Line R.R. Co.*, 157 N.C. 44, 62–63 (1911)) ("Under the general rule, 'the relation of employer and employee is not one of those regarded as confidential.'"). In fact, "where an employee is neither an officer nor a director, extraordinary circumstances are necessary to impose a fiduciary duty arising out of the employment relationship." *Southeast Air Charter, Inc. v. Stroud*, 2015 NCBC LEXIS 82, at *16 (N.C. Super. Ct. Aug. 17, 2015) (citing *Dalton*, 353 N.C. at 652).

106. These "extraordinary circumstances" occur when an employer is "subjugated to the improper influences or domination of his employee." *Dalton*, 353 N.C. at 652; *see also DSM Dyneema, LLC v. Thagard*, 2015 NCBC LEXIS 50, at *21–22 (N.C. Super. Ct. May 12, 2015) (holding that the plaintiff failed to allege "the extraordinary or special type of employer-employee relationship that gives rise to a fiduciary duty" because the facts pleaded did not "allege that Thagard enjoyed the sort of domination or influence over DSM that our courts have found necessary to create a fiduciary duty").

### a. De Piante

107. Epes contends that De Piante was a de facto fiduciary of Epes, as he was responsible for "all sales and operations personnel[,]" "signing checks, authorizing purchases, hiring and firing employees, instituting disciplinary actions, approving employee benefit packages, approving expenses[,]" as well as other duties. (Pl.'s Br. Supp. 21–22.)

108. As an initial matter, De Piante's authority at Epes, and specifically within the International Division, is heavily contested by the parties. Where De Piante has testified that he could not perform certain actions at Epes, such as hiring or firing employees by his own authority, Epes has offered testimony which directly contradicts De Piante's testimony. However, the Court finds it unnecessary to dissect each duty and responsibility that De Piante engaged in while working for Epes, as the fact that he only worked in the International Division of Epes is dispositive.

109. De Piante was hired to serve as the General Manager of the International Division of Epes, as evidenced in his offer letter. (*See* J.A. 0106.) Additionally, Epes' organizational structure—that is two separate but cohesive divisions of Epes—make it clear that De Piante, as General Manager of only the International Division, could not exercise such dominion and control over the entire business of Epes, such that he would owe a de facto fiduciary duty. There has been no evidence presented which suggests that his role as General Manager of the International Division at Epes resulted in "domination and influence" over the entire business of Epes, such that a de facto fiduciary relationship existed between the two. *See Abbitt*, 201 N.C. at 598.

110. Further, even if De Piante had broad authority over the International Division, he still reported to Marcuslund, who served as Managing Director of Epes' International Division. The Court is unconvinced that a divisional employee who directly reports to a divisional manager could exercise control over the entire company as a whole, warranting a finding that a de facto fiduciary relationship could have existed between the two. It appears upon review of the evidence presented that the circumstances of De Piante's relationship with Epes "merely serve to define the nature of virtually all employer-employee relationships; [and] without more, they are inadequate" to establish De Piante's obligations as fiduciary in nature. *See Dalton*, 353 N.C. at 652.

111. Therefore, the Court hereby **DENIES** Plaintiff's Motion as to whether De Piante owed any de facto fiduciary duty to Epes. However, the Court hereby **GRANTS** Defendants' Motion in part as to Count Three for breach of fiduciary duty

as it relates to any alleged de facto fiduciary duty owed by De Piante, and Count Three is **DISMISSED** to that limited extent.

### b. Caron

112. Defendants contend that "Caron's authority within the International Division was limited." (Defs.' Br. Supp. Defs.' Mot. 20, ECF No. 221 ["Defs.' Br. Supp."].) In fact, each month Caron sent "multiple reports which disclosed all financial and transactional information within the International Division" to Siler, to which he testified "there was no information about the International Division . . . that they wanted but did not get or felt they could not get." (Defs.' Br. Supp. 20.)

113. In response, Epes argues that "Caron exercised substantial control over Epes' International Division[,]" and while not formally titled as such, "Caron operated as the Chief Financial Officer of Epes' International Division." (Pl.'s Br. Opp. 23.) Epes contends Caron "managed all accounting functions, was part of Epes' International Division's strategic planning, attended management meetings, and was responsible for office management." (Pl.'s Br. Opp. 23.)

114. There has been no evidence presented that suggests Caron's position as Finance Manager at Epes resulted in "domination and influence" over the company, an essential component of any fiduciary relationship. *See Dalton,* 353 N.C. at 652. Caron was hired as a Finance Manager at Epes, working mainly in the International Division. Her work was consistently reviewed by others within Epes, including by Bodford and Siler. She voluntarily answered questions and offered information to her superiors, and there is no evidence that she was able to extend her reach beyond

the finance division at Epes, such that her influence could be felt throughout the entire company. In sum, her responsibilities at Epes were not "unlike those of employees in other businesses and can hardly be construed as uniquely positioning [herself] to exercise domination" over Epes. *Id.* As a result, no reasonable jury could conclude that a de facto fiduciary relationship existed between Caron and Epes.

115. The Court concludes that there is no genuine issue of material fact regarding the existence of a fiduciary relationship between Caron and Epes. In the absence of a fiduciary duty, there can be no claim for breach. Therefore, Defendants' Motion is **GRANTED** in part as to Count Three for breach of fiduciary duty as it relates to Caron, and Count Three is **DISMISSED** to that limited extent.

**B.**     **Count One: Breach of Contract Against the Individual Defendants**

116. Next, Defendants seek summary judgment on Epes' Count One for breach of contract related to the Individual Defendants' respective Employment Agreements. (Defs.' Mot. 1.)

117. A claim for breach of an employment agreement provision is a species of breach of contract. *Rel. Ins., Inc. v. Pilot Risk Mgmt. Consulting, LLC*, 2024 NCBC LEXIS 99, at **91 (N.C. Super. Ct. July 12, 2024). Breach of contract claims require the "(1) existence of a valid contract and (2) breach of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000).

118. Importantly, when assessing the validity of an employment agreement, North Carolina law distinguishes between restrictive covenants—which restrain trade—and confidentiality agreements—which are only meant to prevent the

disclosure or use of confidential information. *See Amerigas Propane, L.P. v. Coffey*, 2015 NCBC LEXIS 98, at **10 (N.C. Super. Ct. Oct. 15, 2015).

119. "Unlike non-competition and non-solicitation provisions, a nondisclosure provision is generally not considered to be a restraint on trade." *Prometheus Grp. Enters., LLC v. Gibson*, 2023 NCBC LEXIS 42, at **24 (N.C. Super. Ct. Mar. 21, 2023). Accordingly, a "nondisclosure provision is not subjected to the same level of scrutiny as the non-competition and non-solicitation provisions" of an employment agreement. *Id.* at **25. For this reason, "[s]uch agreements may, therefore, be upheld even though the agreement is unlimited as to time and area[.]" *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at **31 (N.C. Super. Ct. Nov. 3, 2011).

120. Nevertheless, "North Carolina courts will treat a non-disclosure agreement as a contract in restraint of trade in appropriate circumstances." *Amerigas Propane, L.P.*, 2015 NCBC LEXIS 98, at **23 (citing *Chemimetals Processing v. McEneny*, 124 N.C. App. 194, 197 (1996)). This Court has explained that

> [a] non-disclosure provision equates to a restrictive covenant in restraint of trade and is subject to the same analysis as a covenant not to compete if "the anticipated and intended effect of the prohibition on [an employee's] disclosure . . . is not to protect [the company's] confidential business information" but rather to prevent a former employee from competing with the former employer. *See Amerigas Propane, L.P.*, 2015 NCBC LEXIS 98, at *24–25 (compiling cases).

*Cnty. of Wake PDF Elec. & Supply Co., LLC v. Jacobsen*, 2020 NCBC LEXIS 103, at *19 (N.C. Super. Ct. Sept. 9, 2020).

121. It therefore follows that

> [a] non-disclosure provision in an employment agreement is enforceable "if it does not seek to prevent a party from engaging in a similar business

in competition with the [employer], but instead seeks to prevent the disclosure or use of confidential information." *Chemimetals Processing v. McEneny*, 124 N.C. App. 194, 197 (1996). To be enforceable, such a non-disclosure agreement requires only "a showing that it protects a legitimate business interest of the [employer]"; time and durational limitations are irrelevant. *Id.* at 197; *Eye Dialogue LLC v. Party Reflections, Inc.*, 2020 NCBC LEXIS 90, at *14–19 (N.C. Super. Ct. July 28, 2020).

*Id.* at *20–21.[4]

122.  Under North Carolina law, the "protection of customer relationships and goodwill against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer." *United Lab., Inc. v. Kuykendall*, 322 N.C. 643, 651 (1988); *see also S. Fastening Sys. v. Grabber Constr. Prods.*, 2015 NCBC LEXIS 42, at *19 (N.C. Super. Ct. Apr. 28, 2015) (holding that requiring employees to sign confidentiality agreements for the purpose of protecting both the company's and the customer's confidential information protected a legitimate business interest of the company).

123.  Epes has asserted Count One against each of the Individual Defendants, alleging they have each breached their respective Employment Agreements through their (1) "solicitation of customers of Epes[,]" (2) "solicitation of employees of Epes[,]"

---

[4] While Defendants contend because the confidentiality provision of each of their Employment Agreements was intended to apply to all aspects of Epes' business, and as a result, this Court should treat and analyze the provision as a restrictive covenant, (Defs.' Br. Supp. 13–14 (citing *Duo-Fast Carolinas, Inc. v. Scott's Hill Hardware & Supply Co.*, 2018 NCBC LEXIS 2 (N.C. Super. Ct. Jan. 2, 2018)), Epes correctly argues that this is not the correct standard in which to review the confidentiality provision, as non-disclosure agreements, such as the confidentiality provision at issue in this case, "are enforceable if they 'protect[ ] a legitimate business interest of the employer' without any regard to 'time and durational limitations.' " (Pl.'s Br. Opp. 16 (citing *Eye Dialogue LLC v. Party Reflections, Inc.*, 2020 NCBC LEXIS 90, at **10 (N.C. Super. Ct. July 28, 2020)) (cleaned up).)

and (3) "use or disclosure of Epes' confidential information including its customer list, customer contact information, customer pricing and customer preferences[.]" (SAC ¶¶ 62–64.)

124.    As an initial matter, Epes voluntarily dismissed Count One to the extent it was premised on the alleged breaches of the non-solicitation provisions within each of the relevant Employment Agreements.  (*See* ECF No. 157 (citing SAC ¶¶ 62–63).) Therefore, to the extent Defendants' Motion seeks summary judgment as to Count One based on the alleged breaches of the non-solicitation provisions, Defendants' Motion is **DENIED** as moot.

125.    As such, the Court narrows its analysis to whether summary judgment is appropriate in favor of Defendants as to Count One to the extent it is based on the alleged breaches of the Employment Agreements through the Individual Defendants' alleged "use or disclosure of Epes' confidential information[.]"  (SAC ¶ 64.)

126.    Each of the Individual Defendants' Employment Agreements contained the same confidentiality provision, providing that the employee

> Recognizes and acknowledges that he will, during his employment by Employer, be privy to confidential, proprietary and non-public information of the Employer Group related to the business of the Employer Group and the Customers of the Employer Group, including, but not limited to, information relating to operations, logistics, transportation, supply, business plans, activities, proprietary and trade secret information, customer, carrier lists, or client lists, and other commercial aspects of its or their business ("Confidential Information"). Accordingly, Employee covenants that he will hold such Confidential Information in a fiduciary capacity for the benefit of the Employer Group and will not, either during his employment or at any time thereafter, either directly or indirectly, use for his own benefit or divulge, disclose or communicate Confidential Information to or for the benefit of any other person, firm, corporation, association or other entity.  Further,

upon request by Employer, Employee will promptly return to Employer, as its property, all records that are in Employee's custody, possession or control and that are related to such Confidential Information, in whatever form those records may exist.

(J.A. 0620 at ¶ 2; J.A. 1214 at ¶ 2; J.A. 1525 at ¶ 2.)

127. Defendants argue that "[b]y its plain terms, the C[onfidentiality] P[rovision] does not apply to the 'Confidential Information' of Epes." (Defs.' Br. Supp. 26.) Instead, Defendants contend that the confidentiality provision applies to "Confidential Information '. . . of the Employer Group related to the business of the Employer Group[ ] and of the Customers of the Employer Group[ ]. . .'" (Defs.' Br. Supp. 26.) In line with this contention, Defendants state that the Individual Defendants "did not receive any 'Confidential Information' related to business that one Employer Group member did with another Employer Group member[,]" or "of those customers who were customers of more than one Employer Group member." (Defs.' Br. Supp. 26.)

128. Further, Defendants argue that the confidentiality provision "does not list any type of financial information[,]" "customer-contact information[,]" or "customer preferences" when defining "Confidential Information" in the confidentiality provision. (Defs.' Br. Supp. 27.) Similarly, Defendants contend that the information alleged to have been disclosed and used by the Individual Defendants is publicly available. (Defs.' Br. Supp. 27.) By way of example, Defendants argue that the "identity of Epes' customers and the carriers it used is publicly available information[,]" and that "any customer information given by a customer to Epes is not Epes' proprietary information." (Defs.' Br. Supp. 27–28.)

129. Epes takes issue with both arguments raised by Defendants. First, as to the interpretation of the "Employer Group" language, Epes argues that Defendants' proposed interpretation would render the confidentiality provision "basically toothless" as it would allow Defendants to "use or disclose confidential information of Epes" even though that is "the opposite of what the [confidentiality provision] provides." (Pl.'s Br. Opp. 14–15.) Second, as to what is included in the definition of "Confidential Information," Epes contends that Defendants' view is far too narrow, as the confidentiality provision explicitly states that the information listed are only examples, evidenced by the "including but not limited to" language included. (Pl.'s Br. Opp. 15.)

130. Upon review of the confidentiality provision found within each of the Employment Agreements, it is clear that the provision was intended to protect Epes' confidential business information, and includes a wide variety of information, which a jury could reasonably find to include Epes' financial information. Further, Epes has put forward sufficient evidence that could permit a jury to conclude that the Individual Defendants acted in violation of their respective Employment Agreements related to their confidentiality obligations by using Epes' confidential information for purposes outside the limits provided. By way of example, there has been sufficient evidence put forth regarding Defendants' access to, and use of, Epes' financial information to obtain financing from Paragon Bank to fund Noble's operations.

131. As a result, there is a genuine issue of material fact as to whether the Individual Defendants breached their respective confidentiality provisions found within their Employment Agreements with Epes.

132. Therefore, the Court **DENIES** in part Defendants' Motion as it relates to Count One for breach of contract to the extent it is based on the confidentiality provisions found within the Epes Employment Agreements of the Individual Defendants, and this claim proceeds to trial accordingly.

## C. Count Two: Injunctive Relief as to Individual Defendants

133. Next, Defendants seek summary judgment on Count Two for injunctive relief. (Defs.' Mot. 1.)

134. "A permanent injunction is an extraordinary equitable remedy and may only properly issue after a full consideration of the merits of a case." *CB&I Constructors, Inc. v. Town of Wake Forest*, 157 N.C. App. 545, 548 (2003) (citation and quotation marks omitted). Furthermore, Plaintiff would only be entitled to injunctive relief if they can demonstrate that they have "no adequate remedy at law and [that] irreparable harm will result if the injunction is not granted." *Vest v. Easley*, 145 N.C. App. 70, 76 (2001) (citation omitted).

135. The Court interprets Defendants' Motion to seek summary judgment as to the availability to Epes of injunctive relief as a remedy in the event Epes succeeds before a jury on any of its remaining causes of action.

136. Epes has asserted Count Two against each of the Individual Defendants, alleging the Individual Defendants have "each breached their [employment]

agreements by using and/or disclosing Epes' confidential information . . . for their own benefit or for the benefit of Noble[,]" (SAC ¶ 68), and as a result, the Individual Defendants should be "permanently enjoined from further using or disclosing to any party any of Epes' confidential information[,]" (SAC ¶ 71).

137. The Court has held that there is a genuine issue of material fact as to whether the Individual Defendants' breached their respective Employment Agreements through disclosure of confidential information. As the merits of this issue have not yet been fully determined, and are intertwined with Count One for breach of contract as to the Employment Agreements, it would be premature to issue a permanent injunction or to determine that under no circumstances might such relief be warranted. *See Levin v. Jacobsen*, 2015 NCBC LEXIS 111, at **32 (N.C. Super. Ct. Dec. 7, 2015) (denying motion for permanent injunction as premature).

138. Therefore, the Court **DENIES** in part Defendants' Motion as it relates to Epes' request for injunctive relief as contained in Count Two, and this claim proceeds to trial accordingly.

### D. Count Five: Aiding and Abetting Against Defendants

139. Next, Defendants seek summary judgment on Count Five for aiding and abetting breaches of fiduciary duties owed. (Defs.' Mot. 1.)

140. Epes has asserted Count Five against each of the Individual Defendants, alleging that each of the Individual Defendants has "aided and abetted the breaches of fiduciary duty of De Piante and Caron." (SAC ¶ 86.)

141. As a preliminary matter, having granted Caron's motion for summary judgement as to Epes' breach of fiduciary duty claim against her, no other Defendant can be held liable for aiding and abetting a breach of fiduciary duty on her part.

142. Defendants additionally seek summary judgment in their favor as to Count Five, arguing that North Carolina does not recognize aiding and abetting breach of fiduciary duty as a cause of action. (Defs.' Br. Supp. 22.) The Court agrees. *See BDM Investment,* 264 N.C. App. at 302 ("[T]he North Carolina Supreme Court has not recognized a cause of action for aiding and abetting breach of fiduciary duty, nor do we recognize it here.").

143. The Court agrees with Defendants' analysis of the law. As a result, the Court concludes that no such cause of action exists under controlling North Carolina law and this claim must be dismissed.

144. Therefore, the Court hereby **GRANTS** in part Defendants' Motion as to Count Five for aiding and abetting breach of fiduciary duties, and Count Five is **DISMISSED**.

E. **Count Six: Tortious Interference with Contracts Against Defendants**

145. Defendants request summary judgment in their favor on Count Six for tortious interference with contracts. (Defs.' Mot. 1.)

146. The elements of a claim for tortious interference with contract are:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Labs.*, 322 N.C. at 661 (1988) (citing *Childress v. Abeles*, 240 N.C. 667 (1954)).

147. Interference with a contract is "justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors." *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498 (1992) (citing *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221–22 (1988)).

148. Epes has asserted Count Six against each of the Individual Defendants, alleging that Defendants "have tortiously interfered with Epes' Agreements with [the Individual Defendants] by inducing [the Individual Defendants] or otherwise causing them to breach the contracts." (SAC ¶ 94.) Additionally, Epes alleges that Defendants lacked any legitimate business interest, as "[t]heir sole motivation was to facilitate and effect the misappropriation of the entirety of Epes' international logistics business through the breach of the Agreements by employees of Epes in a position to cause the misappropriation and diversion." (SAC ¶ 95.)

149. First, as to any argument regarding the enforceability of the Employment Agreements and the confidentiality provisions found therein, the Court has determined that there are genuine issues of material fact surrounding those issues. *Supra* ¶¶ 130–31. As such, any argument that the Employment Agreements, and the confidentiality provisions therein, at the heart of this claim are unenforceable will not carry the day, as a jury is left to determine those issues at a later time.

150. However, Defendants also contend that each Individual Defendant has denied that they "failed to perform their obligations under the Employment Agreement, including the [confidentiality provision,]" or that "the other Individual

Defendants intentionally tried to induce him/her not to perform." (Defs.' Br. Supp. 24.) Defendants argue that Epes "has not and cannot present any evidence of inducement." (Defs.' Br. Supp. 24.)

151. In response, Epes argues that this "is a quintessential fact issue[,]" as the record is "overflowing with evidence that Defendants used Epes' Confidential Information to further Noble's purpose" and that "the Individual Defendants and Noble worked together to induce breaches of the Employment Agreement by the Individual Defendants." (Pl.'s Br. Opp. 24.)

152. When considering the amount of evidence presented related to the Individual Defendants' access and use of Epes' internal systems and information, paired with Noble's use of such information to obtain funding, it is clear that there remain genuine issues of material fact as to whether the Individual Defendants induced one another to breach their respective employment agreements, and the confidentiality provisions found therein.[5]

153. Therefore, the Court hereby **DENIES** in part Defendants' Motion as to Count Six for tortious interference with contract, and this claim proceeds to trial accordingly.

---

[5] To be abundantly clear moving forward, Count Six is based solely on the Confidentiality Provisions found within the respective Employment Agreements, as the Court hereinafter finds that Defendants' Motion is granted as to their request for declaratory judgment as to the enforceability of the non-solicitation provisions in the Employment Agreements (*see infra* ¶ 182) and Epes has voluntarily dismissed its claim for breach of the non-solicitation provisions of the Employment Agreements.

**F. Count Seven: Tortious Interference with Prospective Economic Advantage Against All Defendants**

154. Next, Defendants seek summary judgment on Count Seven for tortious interference with prospective economic advantage. (Defs.' Mot. 1.)

155. "To state a claim for tortious interference with prospective economic advantage, a plaintiff must show that the defendant, without justification, induced a third party to refrain from entering into a contract with the plaintiff and which would have been entered into absent the defendant's interference." *Silverdeer, LLC v. Berton*, 2013 NCBC LEXIS 21, at **31 (N.C. Super. Ct. Apr. 24, 2013).

156. In addition, "[t]o maintain an action for tortious interference with prospective economic advantage, a plaintiff must identify a specific contract between itself and a third party." *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, at **70–71 (N.C. Super. Ct. Oct. 21, 2016) (dismissing claim for tortious interference with prospective economic advantage where plaintiff failed to identify a particular contract that would have been entered but for the defendant's interference). However, a plaintiff's mere expectation of a continuing business relationship is insufficient to establish such a claim. *Dalton*, 353 N.C. at 655. Instead, a plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention. *Id.* at 655.

157. Epes has asserted Count Seven against each of the Individual Defendants, alleging that the Individual Defendants "wrongfully interfered with Epes' contractual and business relationships with its customers by inducing Epes' customers to stop doing business with Epes, to materially reduce their business with Epes, or to break

their contractual relationships with Epes." (SAC ¶ 101.) Epes alleges that this interference was done "without any legitimate business purpose, but instead was done for the sole purpose of injuring and damaging Epes and misappropriating its customer relationships." (SAC ¶ 103.)

158. Defendants contend that Epes has only shown that it "provided services to customers on a shipment-by-shipment, as-needed basis[,]" arguing that summary judgment is appropriately granted where a plaintiff provided services on an as-needed basis. (Defs.' Br. Supp. 25 (citing *Bev. Sys. of the Carolinas,* 368 N.C. 693 (2016)).) Defendants argue that Epes admits it only had ' "a legitimate expectation of continuing those . . . [customer] relationships,' but nothing contractual." (Defs.' Br. Supp. 25 (citing SAC ¶ 99).)

159. In response, Epes argues it has pointed to "*specific customers* with whom Epes had a 'reasonable expectation' of continuing to conduct business[,]" and that Defendants "know who those customers are because they have been" designated as the Disputed Customers in this litigation. (Pl.'s Br. Opp. 26.) Further, Epes relies on its expert report to evidence "the specific relationships interfered with by Defendants and for which Epes seeks damages." (Pl.'s Br. Opp. 26.)

160. Upon review of the evidence presented, the Court determines that while Epes has identified specific customers it contends would have continued to do business with Epes but for Defendants' conduct, it has failed to point to specific contracts that would have ensued but for Defendants' conduct. As the North Carolina Supreme Court held in *Beverage Systems*, an expectation of a continued business

relationship, without pointing to any specific contract, is "insufficient to support a claim for either tortious interference with contract or tortious interference with prospective economic advantage." 368 N.C. at 702.

161. There has been no evidence or argument presented that Epes had contracts pending with specific customers that Defendants interfered with, only that Epes had an expectation that those customers would select Epes as their service provider in the future. The Court's understanding of the transport industry based on arguments made at the Hearing is that each shipment is bid on and won by the company that presents the most competitive offer. As such, Epes has not, and likely cannot, present evidence that specific contracts were interfered with by Defendants because no contracts, or drafts thereof, have been offered that were outstanding at all relevant times to this litigation. In the absence of such evidence, the Court concludes that summary judgment on this claim is appropriate.

162. **THEREFORE**, the Court hereby **GRANTS** Defendants' Motion as to Count Seven for tortious interference with prospective economic advantage, and Count Seven is **DISMISSED**.

G. **Count Four: UDTPA Against Defendants**

163. Defendants request summary judgment in their favor on Count Four for unfair and deceptive trade practices. (Defs.' Mot. 1.)

164. This Court has previously stated that

Chapter 75 of the North Carolina General Statutes [the "UDTPA"] provides, in pertinent part, that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful . . . To successfully state a

claim under [the UDTPA] . . . a plaintiff must allege (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business.

*Poluka v. Willette*, 2021 NCBC LEXIS 105, at **13 (N.C. Super. Ct. Dec. 2, 2021) (cleaned up).

165. This Court has previously held "that the existence of valid underlying claim[ ] for . . . tortious interference with contract is sufficient to give rise to liability on a UDTP theory." *MarketPlace 4 Ins., LLC*, 2023 NCBC LEXIS 31, at **39; *see also Power Home Solar, LLC v. Sigora Solar, LLC*, 2021 NCBC LEXIS 55, at *51 (N.C. Super. Ct. June 18, 2021).

166. Epes has asserted Count Four against all Defendants, alleging that the Individual Defendants "utilized their time (while employees of Epes) and other assets of Epes to form and organize Noble, to compete unfairly with Epes, and to solicit Epes' customers to divert their business from Epes to Noble or other competitive entities[.]" (SAC ¶ 81.)

167. Defendants contend that not only "does the UDTP[A] [not] apply within the employer/employee relationship[,]" but also that all the "alleged harm occurred while the Individual Defendants were at Epes and that Epes alone was harmed." (Defs.' Br. Supp. 22.)

168. Epes argues that while Defendants attempt to center their argument on the "single market participant" exclusion, the "record reflect[s] numerous and varied market participants spanning four continents, dozens of states, and involving the import, export and storage of tens of millions of dollars in freight[.]" (Pl.'s Br.

Opp. 28.) Additionally, Epes represents that the "names and roles of all of those market participants" are evidenced throughout the record, including "throughout text messages, emails, and bank records spanning many months and involving millions of dollars." (Pl.'s Br. Opp. 28.) As such, it is Epes' belief that "the conduct at issue here falls squarely within the broad read of Chapter 75," and as a result, this claim should survive to trial. (Pl.'s Br. Opp. 28.)

169. The Court agrees at least based on the record presently before it. Epes has forecast sufficient evidence that the alleged conduct supporting this claim involved market participants outside of Epes' organization, including—by way of example— the conduct alleged in support of Count Six for tortious interference with contract as to the Individual Defendants.

170. Therefore, the Court hereby **DENIES** in part Defendants' Motion as to Count Four for Defendants' alleged violations of the UDTPA, and this claim proceeds to trial accordingly.

### H. Count Eight: Civil Conspiracy Against All Defendants

171. Next, Defendants seek summary judgment on Count Eight for civil conspiracy. (Defs.' Mot. 1.)

172. To state a claim for civil conspiracy, a plaintiff must show: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Piraino Bros., LLC v. Atlantic Fin. Grp., Inc.*, 211 N.C. App. 343, 350 (2011). "[S]ufficient evidence of the

agreement must exist to create more than a suspicion or conjecture in order to justify submission of the issue to a jury." *Boyd v. Drum*, 129 N.C. App. 586, 592 (1998) (internal quotations omitted). Civil conspiracy is not an independent cause of action in North Carolina; rather, liability for civil conspiracy must be alleged in conjunction with an underlying claim for unlawful conduct. *Toomer v. Garrett*, 155 N.C. App. 462, 483 (2002).

173. Epes has asserted Count Eight against all Defendants, alleging that "Defendants all conspired and agreed to participate in a common scheme to wrongfully compete against Epes in the logistics business by misappropriating Epes' businesses and customers." (SAC ¶ 108.)

174. Defendants' only argument in favor of summary judgment as to this claim is that "[t]o the extent the Court grants Defendants' motion for summary judgment on Epes' underlying tort claims," then Count Eight should fail as well. (Defs.' Br. Supp. 28.) However, as previously discussed, the Court has allowed certain claims supporting the allegations in this claim to survive summary judgment, and as a result, Count Eight survives as well. *See supra* ¶¶ 153, 170; *see also Am. Air Filter Co. v. Price*, 2017 NCBC LEXIS 55, at *32 (N.C. Super. Ct. June 26, 2017) ("Since [Plaintiff's] claim[ ] for . . . unfair trade practices survive[s] dismissal, th[is] claim[ ] can serve as the requisite underlying tort[ ] for a civil conspiracy claim.")

175. Therefore, the Court hereby **DENIES** Defendants' Motion in part as to Count Eight for civil conspiracy, and this claim proceeds to trial accordingly.

## I.      Count Nine: Respondeat Superior Against Noble

176.    Despite purporting to move for summary judgment on all of Epes' claims, Defendants present no argument in their brief in support as to Epes' claim for respondeat superior.[6]  (*See generally* Defs.' Br. Supp.)  Accordingly, to the extent Defendants' Motion seeks summary judgment on Epes' claim for respondeat superior, Defendants' Motions is **DENIED** in part, and this claim proceeds to trial accordingly.

## J.      Counterclaim One: Declaratory Judgment

177.    Lastly, Defendants request affirmative summary judgment on Counterclaim One for declaratory judgment.  (Defs.' Mot. 1.)

178.    Under the North Carolina Declaratory Judgment Act (the "Act"), "[a]ny person . . . whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the . . . statute, ordinance, contract or franchise, and obtain a declaration of rights, status, or other legal relations thereunder." N.C.G.S. § 1-254.  "The purpose of the [Act] is to settle and afford relief from uncertainty concerning rights, status and other legal relations . . . ." *N.C. Consumers Power, Inc. v. Duke Power Co.*, 285 N.C. 434, 446 (1974).  A court may render judgment declaring the rights and liabilities of the respective parties, and affording relief to which the parties are entitled under the judgment, when: (1) "a real

---

[6] BCR 7.2 provides that: "The function of all briefs required or permitted by this rule is to define clearly the issues presented to the Court and to present the arguments and authorities upon which the parties rely in support of their respective positions.  A party should therefore brief each issue and argument that the party desires the Court to rule upon and that the party intends to raise at a hearing."

controversy exists between or among the parties"; (2) "such controversy arises out of [the parties'] opposing contentions"; and (3) the parties "have or may have legal rights, or are or may be under legal liabilities [that] are involved in the controversy, and may be determined by a judgment or decree in the action[.]" *Id.* at 449.

179. "North Carolina courts have held that summary judgment is an appropriate procedure in an action for declaratory judgment." *Medearis v. Trs. of Meyers Park Baptist Church*, 148 N.C. App. 1, 4 (2001) (citing *Frank H. Conner Co. v. Spanish Inns Charlotte*, 294 N.C. 661, 676 (1978); *Montgomery v. Hinton*, 45 N.C. App. 271, 273 (1980)). "Summary judgment may be entered upon the motion of either the plaintiff or the defendant under Rule 56 . . ., and the Rule applies in an action for declaratory judgment." *Bellefonte Underwriters Ins. Co. v. Alfa Aviation, Inc.*, 61 N.C. App. 544, 547 (1983) (citing *Blades v. City of Raleigh*, 280 N.C. 531, 544 (1972)); *see also Hejl v. Hood, Hargett & Assocs.*, 196 N.C. App. 299, 302–03 (2009) (same).

180. Defendants have brought Counterclaim One seeking a judicial declaration concerning the interpretation and enforceability of the non-solicitation covenants in each of the Individual Defendants' respective Employment Agreements. (Answer & Countercl. ¶¶ 135–38; *see supra* ¶ 19 (reciting the non-solicitation provisions at issue).)

181. Defendants contend that the non-solicitation provisions within each of the Individual Defendants' Employment Agreements are unenforceable as a matter of law. (Defs.' Br. Supp. 10.) Epes does not address Counterclaim One in its brief in opposition to Defendants' Motion, (*see generally* Pl.'s Br. Opp.), and as such,

Defendants' request for affirmative summary judgment as to Counterclaim One is unopposed. Defendants have presented sufficient evidence to support a prima facie case for summary judgment as to Counterclaim One, and as a result, Epes was obligated to provide a response to the extent it sought to oppose Defendants' request for summary judgment. By failing to respond as to Counterclaim One, Epes has failed to demonstrate any genuine issues of material fact as to this counterclaim.

182. Therefore, Defendants' Motion is **GRANTED** in part as to Counterclaim One, and the Court hereby enters declaratory judgment that the non-solicitation provisions found within the employment agreements of the Individual Defendants are unenforceable.

## VI. CONCLUSION

183. **THEREFORE**, the Court hereby **GRANTS** in part and **DENIES** in part the Motions are follows:

    a.    Plaintiff's Motion is **DENIED**;

    b.    Defendants' Motion is **GRANTED** in part as to Count Three to the extent Count Three is asserted against De Piante and Caron as to any de facto fiduciary duty owed, but **DENIED** in part as to Count Three to the extent Count Three is asserted against De Piante as to his alleged de jure fiduciary duty owed;

    c.    Defendants' Motion is **DENIED** in part as to Count One;

    d.    Defendants' Motion is **DENIED** in part as to Count Two;

    e.    Defendants' Motion is **GRANTED** in part as to Count Five;

f.        Defendants' Motion is **DENIED** in part as to Count Six;

g.        Defendants' Motion is **GRANTED** in part as to Count Seven;

h.        Defendants' Motion is **DENIED** in part as to Count Four;

i.        Defendants' Motion is **DENIED** in part as to Count Nine; and

j.        Defendants' Motion is **GRANTED** in part as to Counterclaim One.

184.    For the avoidance of doubt, the following claims will proceed to trial in this matter:

a.        Epes' Count One for breach of contract as to the Individual Defendants related to the confidentiality provisions found within their respective Employment Agreements;

b.        Epes' request for injunctive relief as contained in Count Two;

c.        Epes' Count Three for breach of fiduciary duty as to De Piante and his alleged de jure fiduciary duty owed;

d.        Epes' Count Four for UDTPA;

e.        Epes' Count Six for tortious interference with contract as it relates to the confidentiality provisions found within the Employment Agreements;

f.        Epes' Count Eight for civil conspiracy; and

g.        Epes' Count Nine for respondeat superior.

**SO ORDERED**, this the 11th day of March, 2025.


/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases